EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Carmen Rodríguez de Oller<br><br>Demandante-Peticionaria<br><br>vs.<br><br>Transamerica Occidental Life Insurance Company<br><br>Demandada-Recurrida | Certiorari<br><br>2007 TSPR 98<br><br>171 DPR \_\_\_\_ |

Número del Caso: CC-2006-437

Fecha: 30 de mayo de 2007

Tribunal de Apelaciones:

> Región Judicial de San Juan Panel III

Juez Ponente:

> Hon. Pierre E. Vivoni del Valle

Abogados de la Parte Peticionaria:

> Lcdo. René Pinto-Lugo
> Lcdo. Luis Ramón Ortiz Segura

Abogado de la Parte Recurrida:

> Lcda. Jorge Bermúdez Torregrosa

Materia: Sentencia Declaratoria e Incumplimiento de Contrato.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Carmen Rodríguez de Oller

    Demandante-Peticionaria

       vs.                        CC-2006-437       Certiorari

Transamerica Occidental Life
Insurance Company

    Demandada-Recurrida

Opinión del Tribunal emitida por el Juez Asociado señor FUSTER BERLINGERI.

San Juan, Puerto Rico, a 30 de mayo de 2007.

I.

El 19 de julio de 1993 Transamerica Occidental Life Insurance Company (en adelante Transamerica o la aseguradora) emitió una póliza de seguro de vida a favor de Rafael Oller Cestero (en adelante Oller), con límites de $1,000,000 pagaderos a su viuda en la eventualidad de la muerte del asegurado. Para esa fecha, el señor Humberto Torres (en adelante Torres o el agente) fungía como agente general de Transamerica.

El 21 de agosto de 1996 Oller cursó una misiva a Torres mediante la cual expresó su deseo de cancelar la póliza referida y de que se le devolvieran los valores acumulados en ésta.

Torres le recomendó no cancelar la póliza sino, mas bien, dejarla caducar con el transcurso del término dispuesto para el pago de la prima del año 1996-97,[1] pues ello le brindaría aproximadamente un año adicional de protección. Oller acogió la recomendación del agente, por lo que su póliza no fue cancelada.

Durante el transcurso del año 1996-97, Transamerica le envió varias cartas a Oller notificándole la falta de pago. El 21 de julio de 1997 la aseguradora le envió una última notificación y le indicó que, de no recibirse el pago de la prima adeudada para el 21 de agosto de 1997, la póliza en cuestión caducaría. No obstante, mediante una carta recibida el 24 de julio de 1997 en las oficinas de Torres, Transamerica le informó a Oller que la póliza tenía valores acumulados de $2,571.58 al 18 de julio de 1997; y que desde julio de 1996 a julio de 1997 se habían hecho pagos de la prima mediante trece deducciones mensuales de los valores que existían entonces, de $505.65 cada una. En dicha carta, además, se estableció un pago similar para el nuevo año de la póliza de 1997-98.

Así las cosas, el 21 de octubre de 1997 Oller falleció, por lo que su viuda, Carmen Rodríguez de Oller (en adelante la viuda o Rodríguez de Oller), procedió a tramitar la reclamación de los beneficios de la póliza de seguro referida antes. Torres contestó la reclamación de la viuda indicándole que creía que la póliza estaba vigente

---

[1] El año 1996-97 comprendía desde el 19 de julio de 1996 hasta el 19 de julio de 1997.

a la fecha en que Oller falleció.  Procedió entonces a gestionar el pago de los beneficios correspondientes. Sin embargo, Transamerica se negó a pagarlos, por entender que la póliza había caducado previo al deceso del asegurado. Ante la negativa de Transamerica de pagar los beneficios, el 22 de abril de 1998, Torres, en su función de agente general, remitió una comunicación en papel timbrado de Transamerica a Marilyn Platt, examinadora del Departamento de Reclamaciones de Transamerica. Le indicó que, de acuerdo con la carta de la compañía recibida el 24 de julio de 1997, entendía que la póliza en cuestión estaba vigente al momento de la muerte de Oller, ya que dicha póliza reflejaba en ese momento un valor acumulado de $2,613.29, lo cual permitiría realizar deducciones mensuales de $505.65 para el pago de la prima por al menos cuatro meses más. A pesar de los múltiples intentos de  Torres para lograr que se honrara la póliza, Transamerica se negó a pagar.

Rodríguez de Oller acudió entonces ante el Tribunal de Primera Instancia, donde presentó una demanda sobre sentencia declaratoria e incumplimiento de contrato contra Transamerica. En ésta, alegó que Oller obtuvo una póliza de seguro de vida de Transamerica con cubierta de $1,000,000; que estaba vigente a la fecha de la muerte del asegurado, y que la aseguradora se había negado a pagar los beneficios correspondientes. La aseguradora contestó la demanda y

adujo como defensa que Oller había incumplido con las disposiciones de la póliza.

Luego de varios trámites procesales, Transamerica presentó ante el foro primario una solicitud de sentencia sumaria, mediante la cual argumentó que la póliza expedida al asegurado contenía dos requisitos sobre su vigencia y que el incumplimiento de cualquiera de ellos ocasionaba que la póliza caducara automáticamente, a saber: 1) que el valor acumulado de la póliza se mantuviera siempre con un balance suficiente para cubrir la deducción mensual (costo o prima mensual de la póliza) que vencía cada mes[2]; y 2) el pago de la prima anual requerida de $8,000 durante los primeros diez años de la póliza, que tenía que hacerse independientemente de que el valor acumulado fuese adecuado o suficiente para cubrir las deducciones del costo mensual de la póliza. Adujo también Transamerica que el 21 de julio de 1997, le remitió una notificación final a Oller, en la cual le informó que éste adeudaba $6,000 correspondientes al balance de la prima anual requerida al final del cuarto año de la póliza y que el pago por dicha cantidad tenía que ser recibido por Transamerica en o antes del 21 de agosto de 1997 para que la póliza no caducara. Sostuvo que a pesar de que la póliza tenía un valor acumulado de $2,571.58 y que se estaba satisfaciendo la cantidad de $505.65 para el pago única y exclusivamente de las primas mensuales adeudadas —relacionadas éstas con la cubierta de

---

[2] Para la fecha que aquí nos concierne, la deducción mensual era de $505.65.

la mortalidad de la póliza- la retención de los $505.65 estaba completamente separada y no tenía relación alguna con la prima anual requerida de $8,000.[3]

Rodríguez de Oller presentó un escrito de oposición a la petición de sentencia sumaria. En éste, argumentó que las actuaciones de Torres y Transamerica habían modificado las condiciones para el pago de la póliza, a fin de mantenerla en vigor y cobrar las primas. Adujo que las deducciones mensuales que la aseguradora estuvo haciendo por más de un año, en adición a la fijación del pago para el nuevo año de la póliza de 1997-98 evidenciaban dicha modificación. La viuda expuso que como consecuencia de la modificación en los términos de la póliza, ésta se mantuvo vigente a base de las deducciones mensuales de $505.65 que Transamerica estuvo debitando contra el valor acumulado en

---

[3] La aseguradora sustentó su moción de sentencia sumaria con declaraciones juradas de Platt y Torres, quienes adujeron que la póliza en contienda había caducado por el incumplimiento de los términos expresos del contrato. Valga resaltar que hasta ese momento, la posición de Torres había sido sumamente firme en establecer que la póliza estaba vigente a la fecha en que el asegurado murió. No fue sino hasta que se presentó la demanda, que Torres cambió de parecer a los efectos de asumir la misma posición que su principal. Además, el 28 de febrero de 2002, el Tribunal de Primera Instancia emitió una Minuta-Resolución, en la cual expresó: "El Tribunal ha examinado el expediente en su totalidad y de la discusión de las mociones así como, especialmente, de la declaración jurada suscrita por el agente de Transamerica en apoyo de su solicitud de sentencia sumaria *vis-a-vis* la comunicación efectuada por dicho agente el día 22 de abril de 1998, el Tribunal concluye y determina que en esta etapa de los procedimientos como cuestión de hecho concluimos que conforme a la antes referida comunicación, el señor Torres hizo representaciones de agencia conforme la relación contractual legítima existente". La demandada no apeló esta resolución.

la póliza. Razonó que según surgía de la carta enviada por Transamerica, la cual se recibió el 24 de julio de 1997, la póliza tenía valores ascendientes a $2,571.58, cantidad que representaba por lo menos cinco meses adicionales de cubierta, o sea, hasta aproximadamente el 19 de diciembre de 1997, dos meses después de la muerte del asegurado.

En su escrito, la viuda hizo referencia también a las actuaciones de Torres como agente general de Transamerica, las cuales alegadamente obligaban a la compañía de seguros. En específico, hizo referencia a la carta escrita en papel timbrado de Transamerica y dirigida a Platt, en la cual Torres expresó *"it is my understanding that coverage for at least the next four months will continue based on the fund value"*. Rodríguez de Oller argumentó que esta comunicación constituía la opinión de la persona que en efecto diseñó y explicó el programa de seguros a Oller, por lo cual debía tener gran valor probatorio.

Luego de considerar ambas peticiones, el Tribunal de Primera Instancia dictó sentencia sumaria a favor de Rodríguez de Oller, mediante la cual ordenó a Transamerica satisfacer a la demandante $1,000,000. Dicho foro entendió que Torres, como agente general, había modificado los términos y condiciones de la póliza al hacer deducciones de sus valores acumulados para pagarla, por lo cual dicha póliza estaba vigente al momento de la muerte de Oller. Resolvió, además, que las actuaciones y expresiones del agente, al tramitar la reclamación luego de la muerte del

asegurado, impidieron que Transamerica alegara la caducidad de la póliza por falta de pago de la prima anual requerida. El foro primario determinó, además, que Transamerica fue temeraria al negar su responsabilidad conforme la póliza expedida, por lo que le impuso el pago de intereses, más $50,000 por concepto de honorarios de abogado.

Inconforme con la determinación del foro primario, Transamerica acudió ante el Tribunal de Apelaciones mediante un escrito de apelación. El foro intermedio revocó el dictamen del Tribunal de Primera Instancia y dictó una sentencia sumaria a favor de Transamerica. Determinó que los términos del contrato de seguro en cuestión eran claros y que las actuaciones del agente de Transamerica no los había modificado. Resolvió también que la aseguradora no había sido temeraria, sino que había actuado conforme a derecho.

De dicha determinación, Rodríguez de Oller acudió ante nosotros y planteó lo siguiente:

1. Erró el Tribunal de Apelaciones en su determinación de que la póliza contratada por el señor Oller caducó en su cuarto año por éste no haber pagado la prima de $8,000 anuales. La compareciente demostró con hechos no controvertidos que Transamerica mantuvo en todo momento vigente la póliza, que desde agosto de 1996 dedujo mensualmente la cantidad de $505.65 contra el valor acumulado de la póliza de $8,128.26 y que en julio de 1997 la aseguradora estableció como pago para el nuevo año póliza la cantidad de $505.65. Estos actos constituyeron una renuncia de la cláusula de caducidad por falta de pago y una modificación a los términos y condiciones de la póliza, las cuales tuvieron el efecto de mantener vigente la misma.

2. Erró el Tribunal de Apelaciones en su determinación en cuanto a que del contrato entre Transamerica y el agente Humberto Torres surge claramente que el señor Torres es un contratista independiente y de que no tenía autoridad para alterar, modificar o cambiar los términos y condiciones de la póliza. Las representaciones realizadas por el señor Torres obligan a la compañía de seguro por cuanto las mismas fueron expresadas en su calidad de agente general con autoridad en virtud de una relación contractual legítima y existente con Transamerica.

3. Erró el Tribunal de Apelaciones al determinar que la póliza, las declaraciones juradas y las cartas emitidas por Transamerica establecen con claridad la existencia de un derecho para Transamerica. Consta de autos que estos hechos fueron controvertidos por la demandante, quien precisamente estableció, como no controvertidos, el hecho de que los términos y condiciones de la póliza fueron modificados por las actuaciones y representaciones de Transamerica y su agente general Humberto Torres.

4. Erró el Tribunal de Apelaciones al dictar sentencia sumaria a favor de Transamerica. De haber encontrado controversias de hechos entre las aseveraciones del agente Humberto Torres en sus declaraciones juradas realizadas en atención al litigio y sus actuaciones coetáneas a la reclamación, debió haber devuelto el caso al TPI para trámites ulteriores y vista evidenciaria.

5. Erró el Tribunal de Apelaciones al determinar que el Tribunal de Primera Instancia abusó de su discreción al concluir que Transamerica fue temeraria e imponer intereses y honorarios de abogado.

El 23 de junio de 2006 expedimos el recurso solicitado. Contando con la comparecencia de ambas partes, pasamos a resolver.

II.

Por estar íntimamente relacionados, se discuten los primeros tres señalamientos de error de manera conjunta.

A. Agente general

En Puerto Rico, la figura del agente de seguros está reglamentada en el Código de Seguros, donde se define al agente como la persona, razón social o corporación nombrada por un asegurador para gestionar solicitudes de seguros o negociar seguros en su nombre, y si fuere autorizada para ello por el asegurador, para efectuar y refrendar contratos de seguros. 26 L.P.R.A. sec. 901. Dicho agente "es el asesor del asegurado, a quien guía... para la efectividad de sus derechos, y en otras ocasiones es el hombre bueno que interviene amistosamente entre la compañía y el asegurado para zanjar felizmente los reparos y reservas del asegurador y aconsejar objetivamente al asegurado sobre el alcance justo de su derecho". L. Benítez de Lugo Reymundo, *Tratado de Seguros*, Madrid, Instituto Editorial Reus, 1955, Vol. 1, pág. 204.

Por otro lado, conforme al Código de Seguros, el agente general

> "es una persona nombrada o contratada por un asegurador como contratista independiente o por comisión, total o parcialmente, con poderes o deberes generales para inspeccionar el otorgamiento y las operaciones de servicio de pólizas del asegurador, nombrar agentes para el asegurador y llevar a cabo otras funciones que se confieran a agentes generales por la costumbre de la clase o clases de seguros hechos o el tipo de asegurador representado". 26 L.P.R.A. sec. 334.

El agente general posee pleno poder para vincular al asegurador debido a que su conducta, para todos los efectos legales, equivale a la conducta de éste. 7 *Holmes' Appleman on Insurance 2d*, sec. 46.1, págs. 186-90 (1998).

Un agente general se encuentra situado en los "zapatos de su principal" y, de ordinario, tiene autoridad coextensiva con aquélla del asegurador. Como regla general, está autorizado para aceptar riesgos, establecer los términos de los contratos de seguro, cambiar y modificar los términos de las pólizas existentes, emitir nuevas pólizas, renovar viejas pólizas y hacer endosos modificativos tanto en pólizas nuevas como en las ya existentes. *Id*. a la sec. 46.3, págs. 204-5.

La autoridad de un agente general para vincular al asegurador puede ser tanto real como aparente. Es real si el agente efectivamente está autorizado para llevar a cabo las actuaciones que pretende realizar. En cambio, dicho agente posee autoridad aparente si una persona razonablemente podría creer que dicho agente está autorizado para llevar a cabo determinadas actuaciones o para hacer determinadas declaraciones, aunque en realidad no esté autorizado para ello. *Id*. a las págs. 218-9.

**En ausencia de notificación al asegurado de limitaciones impuestas a la autoridad del agente general, sus actuaciones, acuerdos y representaciones vincularán a su principal, aunque éstas contravengan las instrucciones dadas o restricciones impuestas a su autoridad, y aunque el**

**agente esté honestamente equivocado al hacerlas**. *Id*. a las págs. 204-5; 8 *Holmes' Appleman on Insurance 2d*, sec. 50.7, págs. 187-8 (1998).


B. Doctrinas de renuncia e impedimento

Como se sabe, los contratos de seguro, por ser contratos de adhesión, se interpretan liberalmente a favor del asegurado. Rosario v. Atl. Southern Ins. Co. of P.R., 95 D.P.R. 759, 765 (1968); Barreras v. Santana, 87 D.P.R. 227 (1963). Están sujetos, más que cualquier otro contrato bilateral, a la influencia y modificación que sobre el texto produce la intención y el propósito de las partes. Banco de la Vivienda v. Pagán Ins. Underwriters, 111 D.P.R. 1 (1981).

Reconociendo la importancia de la protección que brindan los seguros al bienestar de los ciudadanos, por consideraciones de política pública, los tribunales no favorecen la caducidad de los contratos de seguro. Tampoco favorecen la caducidad por falta de pago de primas. 5 *Holmes' Appleman on Insurance 2d*, sec. 28.3, págs. 328-9 (1998); Rosario v. Atl. Southern Ins. Co. of P.R., *supra*.

Es claro, además, que las doctrinas de renuncia (waiver) e impedimento (estoppel) son de especial aplicación en el campo de los seguros debido a la naturaleza de adhesión de estos contratos. *Id*.

La doctrina de renuncia implica el abandono intencional o la cesión voluntaria de un derecho o

privilegio. Esta doctrina, la cual se basa en la conducta del asegurador, conlleva el conocimiento de dicho derecho o privilegio y la intención de abandonarlo. López v. Atlantic Southern Ins. Co., 158 D.P.R. 562 (2003); Rosario v. Atl. Southern Ins. Co. of P.R., *supra*; 5 *Holmes' Appleman on Insurance 2d*, *supra* a la sec. 28.2, pág. 322-7. La renuncia referida puede ser tanto explícita como implícita, y puede ser manifestada mediante conducta o palabras, ya sea verbalmente o por escrito. *Id.*

Por otro lado, la doctrina de impedimento se ha definido como la abolición de derechos y privilegios del asegurador cuando fuera contrario a la equidad permitir su afirmación. Esta doctrina requiere demostrar que una de las partes en la transacción ha confiado en la apariencia creada por la otra y que resultaría en detrimento para la primera permitir que la segunda renuncie a los efectos de la apariencia creada. *Id.*, a la pág. 322; López v. Atlantic Southern Ins. Co., *supra*.

En materia de seguros, el ordenamiento jurídico ha establecido que estas doctrinas se extienden prácticamente a cualquier situación en la cual el asegurador niegue responsabilidad. Dichas doctrinas se han utilizado en diversas situaciones para demostrar que los aseguradores han renunciado a términos y condiciones estipuladas por ellos en los contratos de seguros. López v. Atlantic Southern Ins. Co., *supra*.

No sólo se han extendido estas doctrinas a condiciones y cláusulas específicas del contrato de seguro, sino también a actos, costumbres y conducta realizada por el asegurador y sus agentes. Así, **las condiciones relativas a la caducidad y suspensión de las pólizas pueden ser entendidas renunciadas por los aseguradores en virtud de estas doctrinas, a través de sus actos o los de sus agentes**. Esto impide que posteriormente los aseguradores puedan levantar dichas condiciones contra el asegurado. *Id.*; 5 *Holmes' Appleman on Insurance 2d*, *supra* a la sec. 28.2, pág. 322.

Con base a estas doctrinas, se ha resuelto que **cuando el asegurador o sus agentes establecen una costumbre sobre el pago de primas distinta a lo expresado en el contrato escrito, el asegurador no puede luego valerse de la letra escrita del contrato sobre el particular en contra del asegurado, aun cuando el contrato diga que los agentes no están autorizados para variar los términos del contrato.** Esto, ya que dicha costumbre o práctica sobre el pago de primas crea en el asegurado una expectativa razonable de que ésta se seguirá observando. *Id.* a las págs. 340, 367; 8 *Holmes' Appleman on Insurance 2d*, *supra* a la sec. 50.7, pág. 191; Rosario v. Atl. Southern Ins. Co. of P.R., *supra*.

C.

En el caso de autos, basándose en las doctrinas referidas de renuncia e impedimento, la demandante alegó

que aunque Oller no realizó el pago de la prima de la forma estipulada en el contrato, Transamerica mantuvo dicha póliza vigente en todo momento mediante las deducciones mensuales que estuvo haciendo de los valores acumulados en la misma. Le asiste la razón. Veamos.

El contrato de seguro ente Transamerica y Oller establecía claramente que este último tenía que pagar una prima anual de $8,000 por los primeros diez años de vigencia de la póliza o que de lo contrario, dicha póliza caducaría. De esta cláusula se desprende indudablemente que ante la falta de pago de dicha prima, Transamerica tenía el derecho a dar por cancelada la póliza.

Mediante una misiva enviada a su agente de seguros, Oller expresó su deseo de cancelar la póliza, ya que no interesaba seguir pagando las primas en cuestión. Cónsono con su interés, el asegurado dejó de pagar dichas primas. Sin embargo, Transamerica, por conducto de su agente general Torres, en lugar de ejercer su derecho y dar por cancelada la referida póliza, decidió mantenerla vigente a base de un cambio en la forma en que ésta se pagaba. En vez de mantener la póliza en vigor mediante el pago de la prima anual requerida de $8,000 según estaba estipulado en el contrato, Transamerica la mantuvo vigente solamente mediante las deducciones o débitos que por más de un año estuvo haciendo de los valores acumulados. Al actuar así, estableció un patrón sobre el pago de primas distinto a lo expresado en el contrato escrito, por lo cual debe

estimarse que renunció a su derecho a invocar la caducidad de la póliza por el incumplimiento de los términos y las condiciones expresas del contrato.

Como consecuencia de esta modificación en la forma de pagar la póliza, Transamerica siguió cobrando su prima de los valores acumulados en la misma. Sin embargo, una vez falleció el asegurado y su viuda reclamó los beneficios bajo la póliza referida, la aseguradora pretendió convenientemente invocar el derecho previamente renunciado y aducir como defensa que el asegurado no se circunscribió a lo expresamente estipulado en el contrato. Pero, por lo señalado antes, la doctrina de impedimento le impedía invocar tal derecho. Los valores acumulados en la póliza al momento de la muerte de Oller eran suficientes para cubrir el pago de la prima hasta dos meses posteriores a tal fecha. El asegurado y la beneficiaria confiaron en la apariencia creada por Transamerica de que el contrato de seguros se mantenía vigente a base de las deducciones mensuales que ésta hacía. Resultaría en un injusto detrimento a éstos permitirle a la aseguradora renunciar a los efectos de la apariencia de vigencia que ella misma creó.

Más aun, una vez enterado de la muerte del asegurado, el agente general de Transamerica le facilitó a la viuda todos los documentos necesarios para la tramitación de los beneficios bajo la póliza. Torres, quien había diseñado la referida póliza y trabajaba con otras similares a diario,

hizo expresiones a los efectos de aseverar que basándose en las deducciones mensuales de $505.65, la póliza de Oller debía haberse mantenido vigente hasta dos meses después de su muerte. Actuando de acuerdo a su entender, éste, en calidad de agente general, gestionó afirmativamente el pago de los beneficios. Valga resaltar que la póliza de seguros de Oller no contenía ninguna limitación en cuanto a la autoridad del agente. Incluso, Transamerica nunca cuestionó en el foro de instancia la autoridad de su agente general ni alegó que éste actuó de forma *ultra vires*. Por el contrario, de la deposición tomada a Torres surge que éste estaba plenamente capacitado para hacer determinaciones sobre la vigencia de la póliza, conocía ampliamente los términos y condiciones del contrato de autos y tenía la autorización de su principal para hacer las expresiones que hizo. De este modo, sus actuaciones como agente general de Transamerica le son imputables a esta última por ser su principal. Por consiguiente, es claro en derecho que procede resolver, con arreglo a las doctrinas de renuncia e impedimento, que el contrato de seguro entre Transamerica y Oller estaba vigente a la fecha en que este falleció.

Es importante destacar, además, que nuestra conclusión de que la póliza de seguro de vida de Oller estaba vigente a la fecha de su muerte está en sintonía con el hecho de que Transamerica nunca envió una notificación de cancelación, ni devolvió los valores acumulados en la misma. Nos explicamos.

En un sinnúmero de jurisdicciones se ha examinado el lenguaje y  el momento en que se hace la notificación de cancelación para decidir si efectivamente las pólizas en controversia han sido canceladas, o si en realidad no ha habido una cancelación, sino un simple requerimiento de pago. De acuerdo a este reiterado análisis, se ha resuelto que cuando la notificación de cancelación establece que la póliza será cancelada en una fecha en específico a menos que las primas adeudadas sean pagadas previo a esa fecha, dicha notificación no se considerará como una notificación de cancelación, sino meramente como un requerimiento de pago. **Una notificación de cancelación no puede expresar simplemente una intención de cancelar dicha póliza en el futuro, sino que la misma tiene que informarle al asegurado de forma clara, inequívoca y con certeza que en efecto su póliza ha sido cancelada.** 6 *Holmes' Appleman on Insurance 2d*, *supra* a la sec. 40.24, pág. 512; Norman v. State Farm Mut. Auto. Ins. Co., 33 P.3d 530 (2001); Pennsylvania National Mutual Casualty Insurance Co. v. Person, 297 S.E.2d 80 (1982); Travelers Ins. Co. v. Jenkins, 285 So.2d 839 (1973); Mitchell v. Burnett, 272 N.E.2d 393 (1971); Ellzey v. Hardware Mutual Ins. Co. of Minnesota, 40 So.2d 24 (1st Cir.) (1949); McNellis v. Aetna Ins. Co., 176 Ill.App. 575 (1913).

En el presente caso, la última comunicación recibida de la aseguradora antes del fallecimiento de Oller, fue la carta de Transamerica a los efectos de informarle al

asegurado que debía $6,000 por concepto de la prima anual requerida y que dicho pago debía ser recibido antes del 21 de agosto de 1997 o que de otro modo la póliza caducaría. Esta misiva no constituyó otra cosa que un mero requerimiento de pago. Se desprende de los hechos que la intención de la aseguradora no era dar por terminado el contrato, sino precisamente mantenerlo vigente e incitar al asegurado a pagar la prima anual. Esto se evidencia con el lenguaje de la referida notificación, la cual expresaba:

> **Your life insurance is in danger of lapsing...The premiums paid in to date (less any Partial Surrenders taken) have been $26,000.00, leaving a minimum payment due of $6,000.00. Payment must be received in our office by August 21, 1997, or your policy will lapse.**
>
> **Please take a few minutes to write us a check...We appreciate your business. Please act now to keep your life insurance in full force and effect.**

Evidentemente esta última comunicación con Oller no tuvo el efecto de cancelar la póliza en contienda. **Transamerica nunca informó que la póliza había sido efectivamente cancelada.** No fue hasta que la viuda reclamó los beneficios al amparo de dicha póliza que la aseguradora convenientemente expresó por primera vez que ésta había sido cancelada.

La aseguradora tampoco devolvió los valores acumulados ni sus intereses a la fecha en que ésta adujo que el

contrato terminó.[4] Esto, a pesar de que se ha establecido claramente que cuando la cancelación de la póliza se efectúa a iniciativa de la aseguradora, la devolución de los valores o la prima no devengada es necesaria para validarla. L.M. Villaronga, *Seguros*, Vol. 62, Rev. Jur. U.P.R., pág. 956 (1993). Ello nos reitera que la póliza no fue cancelada, y que los valores acumulados no fueron devueltos pues se utilizaron para efectuar las deducciones mensuales de $505.65 que mantuvieron la póliza vigente hasta por lo menos el mes de diciembre de 1997, cuando dichos valores acumulados se debieron haber agotado. Estos hechos, pues, demuestran también que la póliza en controversia estaba vigente para la fecha del deceso de Oller.

### III.

En su cuarto señalamiento de error, Rodríguez de Oller alegó que erró el Tribunal de Apelaciones al dictar sentencia sumaria a favor de Transamerica. Le asiste la razón.

Mediante el mecanismo de sentencia sumaria se provee un remedio rápido y eficaz por vía de sentencia cuando la parte que la promueve puede acreditar ante el tribunal que

---

[4] Aunque en uno de sus escritos Transamerica argumentó que no se le devolvió ese dinero al asegurado ya que el contrato de la póliza contenía una penalidad por concepto de cancelación, ésta no presentó evidencia a tales efectos, ni en momento alguno notificó al asegurado que estaría reteniendo dichos valores por concepto de la referida penalidad.

no existe una controversia genuina con relación a los hechos materiales del litigio. Por consiguiente, la celebración de un juicio en su fondo es innecesaria ya que lo único que resta es aplicar el derecho. Consejo Tit. C. Parkside v. MGIC Fin. Corp., 128 D.P.R. 538, 548 (1991). Este mecanismo resulta ser de gran utilidad en el descongestionamiento de los calendarios judiciales. Padín v. Rossi, 100 D.P.R. 259, 263 (1971).

En el caso de autos, ambas partes adujeron ante el Tribunal de Primera Instancia que no existía una controversia real sustancial de hechos, por lo que cada cual solicitó que se dictara sentencia sumaria a su favor. Tanto el foro primario como el tribunal intermedio estuvieron de acuerdo en que el caso de autos no ameritaba la celebración de un juicio en su fondo, por lo que adjudicaron sus méritos basándose en las peticiones de sentencia sumaria. La diferencia de criterio entre dichos foros surgió al determinar a que parte le favorecía el derecho en este caso.

Aunque efectivamente en el presente caso no existía una controversia sustancial de hechos que impidiera dictar sentencia de forma sumaria, el tribunal a quo erró al aplicar el derecho y resolver a favor de la aseguradora. A tenor con lo antes expuesto en esta opinión, procedía dictar sentencia sumaria a favor de la demandante, Rodríguez de Oller.

IV.

Finalmente, la parte demandante señaló que erró el Tribunal de Apelaciones al determinar que el Tribunal de Primera Instancia abusó de su discreción al concluir que Transmerica fue temeraria. El referido error se cometió.

La imposición de honorarios de abogado es de naturaleza idéntica a la imposición de intereses por temeridad. Como es harto conocido, estos proceden cuando la parte perdidosa ha sido temeraria. Ambos persiguen penalizar a aquel litigante perdidoso que por su obstinación, terquedad, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente, a asumir las molestias, gastos, trabajo e inconveniencias de un pleito. O.E.G. v. Román, 159 D.P.R. 401, 418 (2003); Domínguez v. G.A. Life, 157 D.P.R. 690,706 (2002).

La determinación de si una parte ha actuado o no con temeridad descansa en la discreción del tribunal, por lo que los tribunales revisores sólo intervendrán cuando surja de tal actuación un claro abuso de discreción. P.R. Oil v. Dayco, res. el 6 de abril de 2005, 164 D.P.R. ___ (2005), 2005 TSPR 41, 2005 JTS 47.

En el caso de autos la demandada fue temeraria en la tramitación del presente caso. Del análisis de la póliza, sus modificaciones y las actuaciones del agente general, se desprende claramente que la póliza de Transamerica a nombre del asegurado Oller estaba vigente a la muerte de éste.

Procedía que la aseguradora hubiese resuelto la reclamación de la póliza dentro de los noventa días de la reclamación.[5] Así lo determinó el foro primario, cuya determinación no debió haber sido alterada ya que no hubo abuso de discreción de su parte.


V.

Por los fundamentos expuestos, se dictará sentencia para expedir el auto solicitado y revocar la sentencia dictada por el Tribunal de Apelaciones.



JAIME B. FUSTER BERLINGERI
JUEZ ASOCIADO

---

[5] Art. 27.162 del Código de Seguros de Puerto Rico.  26 L.P.R.A. 2716(b).

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Carmen Rodríguez de Oller

    Demandante-Peticionaria

       vs.                  CC-2006-437     Certiorari

Transamerica Occidental Life
Insurance Company

    Demandada-Recurrida

SENTENCIA

San Juan, Puerto Rico, a 30 de mayo de 2007.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte de la presente Sentencia, se expide el auto solicitado y se revoca la sentencia dictada por el Tribunal de Apelaciones, Región Judicial de San Juan.

Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Juez Asociada señora Rodríguez Rodríguez no intervino.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo